# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHAN CHARLES CAREY, | Case No.  1:13-cv-00669-SAB-PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMMENDING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DIRECTING CLERK OF COURT TO ASSIGN DISTRICT JUDGE |
| v. | |
| A. ALPHONSO, et al., | |
| Defendants. | (ECF No. 29) |

Plaintiff Nathan Charles Carey ("Plaintiff") is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.

## I.

## BACKGROUND

This action is proceeding on Plaintiff's claim against Defendant Dr. Alphonso ("Defendant") for deliberate indifference to a serious medical need in violation of Eighth Amendment.

Plaintiff filed this action on May 8, 2013.  On February 9, 2014, the Court screened Plaintiff's complaint and found that Plaintiff stated a cognizable claim against Defendant for deliberate indifference to a serious medical need in violation of the Eighth Amendment.  (ECF

1

No. 6.)  The Court granted Plaintiff the option of filing an amended complaint or notifying the Court of his intent to proceed on the claim against Defendant Dr. Alphonso only.  (ECF No. 6.)  On March 3, 2014, Plaintiff notified the Court of his intent to proceed on the claim against Defendant Dr. Alphonso only.  (ECF No. 7.)

On May 26, 2015, Defendant filed a motion for summary judgment.  (ECF No. 29.)  On June 15, 2015, Plaintiff filed an opposition to Defendant's motion and a response to Defendant's statement of undisputed facts.  (ECF Nos. 30, 31.)  On July 15, 2015, Defendant filed a reply to the opposition for motion for summary judgment and a reply to Plaintiff's response to Defendant's statement of undisputed facts.  (ECF Nos. 34, 35.)  Plaintiff filed a rebuttal to Defendant's reply, which is construed as a surreply, on August 12, 2015.  (ECF No. 36.)

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendant does not bear the burden of proof at trial and in moving for summary judgment, he need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If Defendants meet their initial burden, the burden then shifts to

2

1   Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."  In

2   re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323).  This requires Plaintiff

3   to "show more than the mere existence of a scintilla of evidence."  Id. (citing Anderson v.

4   Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

5        However, in judging the evidence at the summary judgment stage, the Court may not

6   make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless,

7   Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw

8   all inferences in the light most favorable to the nonmoving party and determine whether a

9   genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo

10  Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and

11  citation omitted).  The Court determines only whether there is a genuine issue for trial and in

12  doing so, it must liberally construe Plaintiff's filings because he is a pro se prisoner.  Thomas v.

13  Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

**III.**

**DICSUSSION**

**A.      Allegations of Complaint**

17       Plaintiff alleges that his Eighth Amendment rights were violated when Defendant acted

18  with deliberate indifference to his serious medical needs.

19       Plaintiff suffers from a back injury.  While incarcerated at the Sierra Conservation Center

20  (SCC) in Jamestown, he was given a temporary lower bunk.  In January 2012, Plaintiff was

21  transferred to California Substance Abuse and Treatment Facility at Corcoran State Prison

22  ("SATF"), where he is currently incarcerated.  Prison staff did not accommodate Plaintiff's

23  medical chrono for a lower bunk.  Plaintiff spent the first six months in excruciating pain as he

24  was housed on the top tier on a top bunk.  During that time, he begged for x-rays and an MRI.

25  These examinations proved that Plaintiff suffers from severe nerve damage.  Doctor A. Alphonso

26  continued to deny that Plaintiff was in need of a lower bunk/lower tier chrono.  Plaintiff

27  continued to experience loss of functionality in his hips and knees from the nerve damage and he

28  remains in constant sometimes debilitating pain.  Plaintiff filed multiple appeals, which were all

denied.

On November 13, 2012, the bunks in building 1 were raised due to a court order related to wheelchair accessibility.  Plaintiff informed the building correctional Officer Ascevito, if the bunks were going to be increased in height by one and one half feet, he would not be able to be housed in that building because he already experienced pain from the top bunk.  Officer Ascevito and Officer Southerland looked at each other and laughed.

On November 20, 2012, when Plaintiff returned from his job assignment, Officer Ascevito stopped him and told him the only way he would move Plaintiff is if he provided a name and CDC number of an inmate who was threatening Plaintiff.  Fifteen minutes after Plaintiff arrived back in the building, the announcement was made that the bunks were going to be increased in height at 10:00 a.m.  Plaintiff immediately expressed his medical concerns to Officer Ascevito who informed Plaintiff he could not be moved.

At 4:30 p.m. that day, Officer Marquez found Plaintiff standing next to his bunk.  Officer Marquez advised Plaintiff to visit him after the inmate count was complete.  When Plaintiff went to his office with all of his medical documents, Officer Marquez agreed that Plaintiff should have a lower bunk, but nothing could be done without a chrono from a doctor.  Officer Marquez spoke with Sergeant Ponder, who told Marquez to write Plaintiff a disciplinary violation for delaying a peace officer.

On November 21, 2012, Plaintiff could not get on the top bunk and received a second disciplinary violation.

On November 22, 2012, Plaintiff again advised prison officials that he would not get on the top bunk.  At this time, he had removed his mattress to the floor and was sleeping there at night.  On this same day, Sergeant Ponder and three or four other correctional officers went to Plaintiff's cell to harass and threatened Plaintiff about the issue.

Plaintiff finally received a chrono for a lower bunk from a different doctor.

Plaintiff presently has difficulty walking and has continuous progressive pain in his back which radiates to his hips and knees.

\ \ \

**B.     Undisputed Facts[1]**

1.      Plaintiff is a state inmate in the custody of the California Department of Corrections and Rehabilitation.

2.      Plaintiff was housed at Sierra Conservation Center (SCC) prior to his transfer to SATF in January 2012.

3.      Defendant worked as a Physician and Surgeon at SATF in 2012 and 2013.

4.      The SATF Operational Procedure (OP) 458 regarding Comprehensive Accommodation Chrono, and the Inmate Medical Services Policies & Procedures (IMSP&P), Chapter 23 (Comprehensive Accommodation Chrono), provide criteria to be used by a Primary Care Physician (PCP) to determine an inmate's eligibility for requested accommodations that are medically necessary.  Under OP 458 and Chapter 23 of the IMSP&P, the criteria to determine an inmate's eligibility for bottom bunk/ground floor housing consist of:

- Seizure disorder;
- Disorder or treatment affecting equilibrium;
- Alzheimer's or other dementia;
- Abdominal, chest, or back surgery within the last 6 months;
- Full-time wheelchair user;
- Vision impairment impacting placement (DVP);
- Amputation or severe weakness of upper or lower extremity;
- Body Mass Index (BMI) greater than 40;
- Severe orthopedic conditions of hips, knees, ankles, feet or upper extremity, which physically prevent or is unduly painful or dangerous to the patient from climbing to the upper bunk;
- Due to advanced age, the inmate-patient is at risk of injuring him/herself by climbing to the upper bunk. For the purpose of this criterion, advanced age is considered to be 60 years old; and
- Pregnancy.

5.      In December 2008, while Plaintiff was housed at SCC, lumbar spine x-rays were taken, and the results showed normal alignment, no arthritic disease, and no

---

[1] Plaintiff objects to Defendant's Undisputed Facts Nos. 6, 7, 8, 9, 10, 11, 12, 14, 15, 20, 22, 25, 26, 28, 33, 34, 35, 36, 38, 40, 41, and 42.  Defendant's Undisputed Fact No. 42 is clearly a disputed fact.  As to the other Undisputed Facts that Plaintiff objects to, Plaintiff fails to provide citations required under Local Rule 260(b) that would enable the Court to ascertain the basis for the alleged dispute or determine whether there actually is a material disputed fact. Therefore, these facts, except for Defendant's Undisputed Fact No. 42, are considered undisputed facts for purposes of this motion.

1    abnormality detected.

2    6.    In February 2009, Plaintiff was seen by Dr. Bangi at SCC for follow up of

3          complaints of back pain.   Dr. Bangi's notes from this visit indicated that

4          Plaintiff's request for a Magnetic Resonance Imaging (MRI) and Chrono for low

5          bunk, low tier, was denied, indicating that the Inmate Policies and Guidelines

6          criteria did not support dispensing a Chrono for Plaintiff.

7    7.    Plaintiff saw Dr. Bangi again in April 2009, for follow-up of a CT scan/facial

8          bone procedure for a chronic problem of nasal congestion.  Dr. Bangi's notes from

9          this visit indicate that Plaintiff again requested a low bunk, low tier Chrono, citing

10         chronic low-back pain.  Dr. Bangi noted that Plaintiff did not meet the criteria for

11         this, and his Chrono request was denied.

12   8.     Plaintiff next saw Dr. Bangi in July 2009, whose notes indicated that Plaintiff was

13         on ibuprofen for chronic low-back pain, which was effective.   Additionally, Dr.

14         Bangi noted no radiculopathy, and recommended that Plaintiff continue on his

15         current treatment plan and to follow self-directed physical therapy exercises.

16   9.     In September 2009, Plaintiff saw Dr. Thomatos at SCC, who noted that Plaintiff's

17         x-rays were completely normal, and that there was not even vertebral height

18         differences.  Dr. Thomatos indicated that Plaintiff's request to be excused from

19         scullery work assignment was not justified, and that a CDCR 1845 (Disability

20         Placement Program Verification) evaluation confirmed that that there was no

21         permanent disability, and Plaintiff's objective data did not support his claimed

22         disability.   Dr. Thomatos specifically noted that Plaintiff had been observed on

23         the yard showing no disability whatsoever.  A CDC 128C (Medical Chrono)

24         signed by SCC Chief Medical Officer Dr. Clair was prepared, which noted that

25         Plaintiff did not have any verification of his claimed disability.

26   10.   In January 2010, Plaintiff was seen by Dr. Thomatos for follow-up.    Dr.

27         Thomatos prescribed a TENS unit for Plaintiff because that appeared to be what

28         helped the best with physical therapy. Dr. Thomatos noted that Plaintiff had just

6

1    finished a total of 8 sessions of physical therapy.

2    11.    Plaintiff saw Dr. Thomatos again in June 2010, at which time Dr. Thomatos noted

3           that Plaintiff was doing great with Indomethacin and the TENS unit. Plaintiff had

4           no side effects, and was pleased with his increased activity level.

5    12.     In September 2010, Dr. Krpan and Dr. Thomatos saw Plaintiff for his complaints

6           of sudden onset of acute back pain. Plaintiff was provided with a bag of ice that

7           he requested, as well as a 5-day dose of methocarbamol for muscle spasm.

8           Plaintiff reported to Dr. Thomatos soon after that he was back to normal without

9           any problems.

10   13.    In October 2010, Dr. Thomatos saw Plaintiff, who requested a low tier Chrono.

11          Dr. Thomatos noted that Plaintiff's knees were working fine, and he was able to

12          get up and down without difficulty.  Dr. Thomatos explained to Plaintiff that there

13          was no justification for a low tier Chrono.

14   14.    Plaintiff next saw Dr. Thomatos in January 2011, who noted that Plaintiff was

15          doing well with Indomethacin, and that he would see Plaintiff again in 75-85 days

16          for a medication refill.

17   15.    In May 2011, Plaintiff was seen by Dr. Allen for complaints of back pain.

18          Plaintiff reported his legs giving out and pain from thigh to foot. Dr. Allen noted

19          that Plaintiff was quite animated in his movements and spoke in an aggressive

20          manner.   Dr. Allen discussed with Plaintiff home rehabilitation exercises, but

21          Plaintiff stated he had already been taught those exercises.  Dr. Allen noted that

22          Plaintiff was not cooperative with patient education regarding doing those

23          exercises as instructed.

24   16.    In late May 2011, Plaintiff's lumbar spine x-rays revealed mild degenerative

25          changes at L5-S1.  Given Plaintiff's age of mid-30s when the x-rays were

26          obtained (Plaintiff was born in 1976), such mild generative findings are common,

27          and is not an indication of significant abnormality or pain.

28   17.    Plaintiff underwent an Electromyogram and Nerve Conduction Study in July

                                          7

2011, and the results showed: (a)no electrophysiological evidence suggestive of a lumbosacral radiculopathy process involving the L2-S2 nerve roots bilaterally; (b) no electrophysiological evidence suggestive of an isolated peroneal nerve bilaterally; (c) no electrophysiological evidence suggestive of an isolated tibial nerve entrapment at the ankle or leg bilaterally; (d) no electrophysiological evidence suggestive of an underlying polyneuropathy process of the bilateral lower extremities; and (e) no electrophysiological evidence suggestive of a myopathic disease process of the bilateral lower extremities.

18. In January 2012, a CDCR 7371 (Health Care Transfer Information) form was completed in preparation for Plaintiff's transfer from SCC to SATF. No urgent medical needs, disability accommodations, or medical devices (except for TENS unit and ear molds) were noted.

19. The Interdisciplinary Progress Notes (CDCR 7230-MH) from February 2012 at SATF noted that Plaintiff has a major mental illness requiring placement in CCCMS, and has a low tolerance for frustration and poor coping skills.

20. On February 28, 2012, Dr. Alphonso saw Plaintiff after he claimed that he fell down when his back gave way, however, Dr. Alphonso observed him walking into the clinic without distress. Plaintiff reported that his lower-back pain was controlled by Indomethacin, and Dr. Alphonso explained that he should take Tylenol to minimize Indomethacin side effects. Plaintiff demanded a lower bunk Chrono. But Plaintiff's exams and studies were normal, and Dr. Alphonso determined that he was not eligible under the criteria listed in SATF OP 458 and IMSP&P Chapter 23 to receive bottom bunk or ground floor housing. I therefore denied Plaintiff's request. Plaintiff became aggressive and threatened Dr. Alphonso, and correctional staff had to escort him out of the exam area.

21. In March 2012, due to Plaintiff's complaints of right hip and right knee pain, x-rays were obtained. The results revealed no fractures or abnormal findings.

22. On March 16, 2012, Dr. Alphonso saw Plaintiff again, who demanded that Dr.

8

Alphonso provide him with a lower bunk Chrono and a cane.  Dr. Alphonso explained to him that because he did not meet the criteria, his request was denied. Plaintiff was also observed walking without difficulty or a limp.  Dr. Alphonso renewed Plaintiff's medications, and prescribed medication for his acne and shampoo for his scalp irritation.

23.     In April 2012, Plaintiff's lumbar x-rays showed mild spondylitis and severe degenerative disk disease at L5-S1.

24.     Dr. Scharffenberg saw Plaintiff on May 23, 2012, and discussed his medical concerns.  Dr. Scharffenberg noted that nerve conduction studies were negative despite Plaintiff's problem list.  Dr. Scharffenberg recommended that Plaintiff continue with his medications and TENS unit, and Plaintiff verbalized his understanding of the assessment and plan.

25.     Plaintiff saw Dr. Scharffenberg again on June 27, 2012, at which time Plaintiff was complaining of difficulty walking and requesting a cane. However, Dr. Scharffenberg observed Plaintiff walking unaided just fine during this visit. Dr. Scharffenberg ordered an MRI. Dr. Scharffenberg noted that Plaintiff appeared to be dissatisfied with his care, no matter what was suggested, and was generally demanding and unhappy. (Alphonso Decl. at ¶ 25.)

26.     On July 24, 2012, Dr. Alphonso saw Plaintiff, and continued his medications and ordered lab/blood work.  Because Plaintiff was walking fine, Dr. Alphonso did not determine him to be disabled for purposes of any requirement of accommodation under the ADA.

27.     In late-July 2012, Plaintiff's lumbar MRI indicated central disk extrusion at L5-S1,with loss of normal disc height and narrowing of both neural foramina and probable impingement of both exiting L5 nerve roots at neural forminal compartment. Essentially, nerve passageways in the spine have less space than they used to, possibly leading to the compression or pinching of nerves on either side of each vertebra, which can be caused by common degenerative conditions.

9

Commonly, a variety of non-operative, conservative methods are recommended for this condition, such as intermittent periods of rest, alternating hot and cold compresses, low-impact exercise, pain medication, and gentle stretching.

28. Dr. Alphonso saw Plaintiff on August 14, 2012, and denied Plaintiff's request for a lower bunk/lower tier Chrono because he did not meet the criteria set forth in SATF OP 458 or Chapter 23 of the IMSP&P.  Even though Plaintiff complained of lower back pain, and there was indication of degenerative disk disease, these factors do not necessarily medically constitute "severe orthopedic conditions of hips, knees, ankles, feet or upper extremity, which physically prevent or is unduly painful or dangerous to the patient from climbing to the upper bunk," because the physical exams and diagnostics of Plaintiff did not substantiate that he was physically prevented from climbing to the upper bunk, or that it was unduly painful or dangerous for him to do so.  Additionally, Plaintiff was observed on multiple occasions walking unaided, without problems, and pushing other inmates' wheelchairs.

29. Plaintiff underwent a Telemedicine Neurological Surgical Consultation on October 26, 2012, and Dr. Rahimifar noted that surgery was not indicated for Plaintiff. Dr. Rahimifar recommended Neurontin, a soft lumbar corset, that Plaintiff avoid heavy lifting over 40 pounds, and engage in no repetitive bending or twisting.  Dr. Rahimifar recommended a follow-up in four months.

30. On November 6, 2012, Dr. Alphonso saw Plaintiff, and completed a CDC 7410 (Comprehensive Accommodation Chrono) so that he could obtain a permanent soft lumbar corset, and physical limitations to any job assignments, in accordance with Dr. Rahimifar's recommendation regarding no heavy lifting or repetitive bending or twisting.   In addition, because Neurontin is a nonformulary medication, Dr. Alphonso completed a CDCR Form 7374 (NonFormulary Drug Request) for Plaintiff to receive this medication.  These requests were granted by SATF Chief Medical Executive Dr. Enenmoh.

10

31.   Plaintiff was seen again for a Telemedicine Neurological Surgical Consultation on March 1, 2013, and Dr. Leramo recommended that Plaintiff continue with conservative therapy, including medications, a lumbar brace, and work restrictions.

32.   Physician Assistant (PA) Tiggs-Brown saw Plaintiff on March 13, 2013.  PA Tiggs-Brown completed a Disability Placement Program Verification evaluation (CDCR 1845), and specifically noted  that verification of claimed disability was not confirmed regarding mobility impairment.   PA Tiggs-Brown completed a CDC 128C Chrono noting that Plaintiff was "able to ambulate greater than 100 yards without assistive devices."   PA Tiggs-Brown also completed a CDCR 7410 requesting that Plaintiff be provided with a bottom bunk for one-year.

33.    Dr. Alphonso examined Plaintiff on April 15, 2013, who reported numbness and aches in his left shoulder and leg, and requested a nerve study. Plaintiff also appealed the denial of his ADA status. Dr. Alphonso noted that Plaintiff did not meet the criteria to be identified as disabled, or DPM, in which an inmate has an orthopedic, neurological or medical condition that substantially limits ambulation (cannot walk 100 yards on a level surface without pause). Plaintiff had been repeatedly observed walking on the yard and to the clinic without any difficulty, and thus, the criteria of substantially limited ambulation was not met.

34.   Because PA Tiggs-Brown had recently completed a CDCR 7410 requesting that Plaintiff be provided with a bottom bunk for one-year and it was approved by Dr. Ugwueze, and given Plaintiff's work restrictions, his on-going complaints of pain, minimizing disruption of Plaintiff's housing assignment for a bottom bunk, and my examination of Plaintiff at this visit, Dr. Alphonso prepared a CDCR 7410 and (CDCR 128-C3) Medical Classification Chrono on April 15, 2013, continuing Plaintiff's accommodation for a bottom bunk for one year, as well as the back brace and TENS unit that Dr. Alphonso had previously authorized.

35.    Dr. Alphonso saw Plaintiff on May 21, 2013, and noted that he seemed to be

seeking increased pain medications, which would be evaluated by the Medical Authorization Review Committee. Dr. Alphonso noted that Plaintiff had been observed multiple times pushing another inmate in a wheelchair on the yard, however, he exaggerated his pain when he was in the clinic. Dr. Alphonso referred Plaintiff to psychiatry for his depression and other psychological issues.

36.     Dr. Alphonso saw Plaintiff on May 30, 2013, and had observed him walking without difficulty or limp to the clinic.  Dr. Alphonso noted that the Medical Authorization Review Committee had denied Plaintiff's request for additional pain medication.  Dr. Alphonso ordered blood/lab work for Plaintiff, and noted that he was taking Tylenol with Codeine, Neurontin, and had a back brace, in accordance with the prior recommendations by the Telemedicine Neurological specialists.

37.     On July 9, 2013, Dr. Alphonso prepared a CDC 7243 (Physician Request for Health Services) for Plaintiff to receive a physical therapy consultation for his back.

38.     Dr. Alphonso's decisions to deny Plaintiff's requests for a low tier/low bunk Chrono in 2012 and early 2013 were based on his medical training, experience working in a prison, examinations of Plaintiff, reviews of his Unit Health Records and diagnostics, and application of the criteria in SATF OP 458 and IMSP&P, Chapter 23.

39.     When Dr. Alphonso saw Plaintiff on April 15, 2013, PA Tiggs-Brown had recently completed a CDCR 7410 requesting that Plaintiff be provided with a bottom bunk for one-year. While Dr. Alphonso did not completely agree with PA Tiggs-Brown's decision, it is not uncommon for medical care providers to use various factors in determining the proper treatment for a patient, and to make different recommendations or decisions. At this visit, after Dr. Alphonso's examination of Plaintiff, Dr. Alphonso considered his work restrictions, on-going

complaints of pain, medical history, minimizing disruption of Plaintiff's housing assignment for a bottom bunk since PA Tiggs-Brown had authorized a bottom bunk, and prepared a CDCR 7410 authorizing bottom bunk for one year.

40.     In a prison setting, an inmate such as Plaintiff may become frustrated based on his disagreements regarding what he believes appropriate medical care to be, and become fixated on obtaining certain accommodations, medications, or treatment, to the point of exacerbating mental health issues.

41.     It is Dr. Alphonso's medical opinion that Plaintiff received frequent and appropriate medical care while at SCC and SATF for his complaints of lower back pain.

## C.     Legal Standard for Deliberate Indifference to Serious Medical Need

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement." Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) citing Farmer v. Brennan, 511 U.S. 825, 847 (1994) and Rhodes v. Chapman, 452 U.S. 337, 347 (1981)) (quotation marks omitted).  While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain.  Morgan, 465 F.3d at 1045 (citing Rhodes, 452 U.S. at 347) (quotation marks omitted).

Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety, Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains while in prison represents a constitutional violation, Morgan, 465 F.3d at 1045 (quotation marks omitted).  To maintain an Eighth Amendment claim, inmates must show deliberate indifference to a substantial risk of harm to their health or safety.  See, e.g., Farmer, 511 U.S. at 847; Thomas v. Ponder, 611 F.3d 1144, 1151-52 (9th Cir. 2010); Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir. 2009); Morgan, 465 F.3d at 1045; Johnson, 217 F.3d at 731; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

For claims arising out of medical care in prison, Plaintiff "must show (1) a serious

1   medical need by demonstrating that failure to treat [his] condition could result in further

2   significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's

3   response to the need was deliberately indifferent."   Wilhelm v. Rotman, 680 F.3d 1113, 1122

4   (9th Cir. 2012) (citing Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)).   Deliberate

5   indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or

6   possible medical need, and (b) harm caused by the indifference."   Wilhelm, 680 F.3d at 1122

7   (citing Jett, 439 F.3d at 1096).   The requisite state of mind is one of subjective recklessness,

8   which entails more than ordinary lack of due care.   Snow v. McDaniel, 681 F.3d 978, 985 (9th

9   Cir. 2012) (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

10          **D.      Findings**

11          The Plaintiff's claim against Defendant arises out of Plaintiff's disagreement with

12   Defendant's decision not to give Plaintiff a lower bunk/lower tier Chrono.  Defendant argues that

13   Plaintiff's back condition did not present an objectively serious medical need and Defendant did

14   not act with deliberate indifference to Plaintiff's back condition, specifically Plaintiff's request

15   for a low bunk/tier Chrono at SATF.

16          "A medical decision not to order [a form of treatment] . . . does not represent cruel and

17   unusual punishment."   Estelle, 429 U.S. at 107-08.   A mere difference of opinion between

18   Plaintiff and Defendant regarding medical treatment does not give rise to a claim under Section

19   1983.  Snow, 681 F.3d at 987-88; Wilhelm, 680 F.3d at 1122-23; Franklin v. Oregon, 662 F.2d

20   1337, 1344 (9th Cir. 1981).  Rather, Plaintiff must show that the course of treatment chosen was

21   medically unacceptable under the circumstances and that it was chosen in conscious disregard of

22   an excessive risk to Plaintiff's health.   Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)

23   (quotation marks omitted); accord Snow, 681 F.3d at 987-88.   A medical professional who

24   makes a mistake—even one constituting gross negligence or medical malpractice—is not

25   deliberately indifferent for the purposes of the Eighth Amendment unless his conduct was

26   medically unacceptable under the circumstances and pursued in "conscious disregard" of an

27   excessive risk to the Plaintiff's health.  See Estelle, 429 U.S. at 104–06; Toguchi, 391 F.3d at

28   1058.

Under the SATF Operational Procedure (OP) 458 and Chapter 23 of the Inmate Medical Services Policies & Procedures (IMSP&P), an inmate is eligible for bottom bunk/ground floor housing if the inmate has:

- Seizure disorder;
- Disorder or treatment affecting equilibrium;
- Alzheimer's or other dementia;
- Abdominal, chest, or back surgery within the last 6 months;
- Full-time wheelchair user;
- Vision impairment impacting placement (DVP);
- Amputation or severe weakness of upper or lower extremity;
- Body Mass Index (BMI) greater than 40;
- Severe orthopedic conditions of hips, knees, ankles, feet or upper extremity, which physically prevent or is unduly painful or dangerous to the patient from climbing to the upper bunk;
- Due to advanced age, the inmate-patient is at risk of injuring him/herself by climbing to the upper bunk. For the purpose of this criterion, advanced age is considered to be 60 years old; and
- Pregnancy.

Therefore, Plaintiff needed to have one of the conditions in the eligibility list in order to receive lower bunk/ground floor housing. Defendant argues that Plaintiff did not meet any of the criteria for lower bunk/ground floor housing, and specifically Plaintiff's back condition did not physically prevent him from climbing to the upper bunk and it was not unduly painful or dangerous for him to do so.

Plaintiff was transferred to SATF in January 2012. On April 15, 2013, Defendant wrote Plaintiff a Chrono for a lower bunk after PA Tiggs-Brown and Dr. Ugwueze recommended one. Therefore, the question is whether the delay in giving Plaintiff the low bunk/tier Chrono between January 2012 and April 15, 2013, was deliberate indifference by Defendant. Delays in providing medical care may manifest deliberate indifference. Estelle v. Gamble, 429 U.S. 97, 104-105 (1976). To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful. See Hallett v. Morgan, 296 F.3d 732, 745-746 (9th Cir. 2002); Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994). In this regard, "[a] prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." Jett v. Penner, 439 F.3d at 1096.

1   Plaintiff claims that the failure to provide him with a medically appropriate bunk and cell

2   assignment (low bunk/tier) caused him to suffer severe, disabling pain in the course of accessing

3   his top bunk on a higher tier.  Plaintiff argues that he experienced loss of functionality in his hip

4   and knees from the nerve damage, and that he has been in constant, and sometimes, debilitating

5   pain.  However, contrary to Plaintiff's claim, the evidence does not support his interpretation.

6   Prior to Plaintiff's incarceration at SATF, he was incarcerated at Sierra Conservation

7   Camp and saw doctors there for his back pain.  On December 23, 2008, Dr. Lincoln Russin

8   found that Plaintiff's alignment was normal, he does not have an arthritic disease, no fracture or

9   congenital anomaly can be detected, and no abnormality can be detected.  (ECF No. 29-4 at 23.)

10   On February 17, 2009, Dr. Edwin Bangi examined Plaintiff for a follow-up for back

11   problems and noted that Plaintiff had tenderness of the paravertebrals at L3-L4-L5 and T10-T11,

12   pain with hip flexion and extension, limitation of rotatory movement, positive Waddell sign on

13   axial loading, negative modified SLR.  (ECF No. 29-4 at 24.)  Dr. Bangi also noted that Plaintiff

14   was able to do heel walk, tiptoes, and a full squat and that he had no abnormality of gait.  (ECF

15   No. 29-4 at 24.)  Dr. Bangi denied Plaintiff's request for a MRI and Chrono for low bunk, low

16   tier finding that the Inmate Policies and Guidelines criteria did not support dispensing a Chrono

17   for this condition.  (ECF No. 29-4 at 24.)

18   On April 29, 2009, Dr. Bangi examined Plaintiff and denied Plaintiff's request for a low

19   bunk, low tier Chrono, because Plaintiff did not meet the criteria.  (ECF No. 29-4 at 25.)  On July

20   7, 2009, Dr. Bangi noted that Plaintiff should continue his current treatment plan and self-

21   directed physical therapy exercises would be beneficial for Plaintiff's chronic low back pain.

22   (ECF No. 29-4 at 26.)

23   On September 11, 2009, Dr. Georgia Thomatos saw Plaintiff and noted that Plaintiff's x-

24   rays were completely normal, and that there were not even vertebral height differences, which is

25   seen with disk bulges.  (ECF No. 29-4 at 27.)  Dr. Thomatos did not excuse Plaintiff from his

26   scullery work assignment, and indicated that a CDCR 1845 (Disability Placement Program

27   Verification) evaluation confirmed that that there was no permanent disability and Plaintiff's

28   objective data did not support his claimed disability.  (ECF No. 29-4 at 27.)  Dr. Thomatos

specifically noted that Plaintiff had been observed on the yard showing no disability whatsoever. (ECF No. 29-4 at 27.)  That same day, Dr. J. St. Clair signed off on CDC 128C that indicated that Plaintiff does not have a permanent disability.  (ECF No. 29-4 at 28.)

On October 20, 2009, Dr. Thomatos saw Plaintiff for a follow-up and denied Plaintiff's low bunk and low tier request, because Plaintiff had no trouble with his knees at all and his low back pain was unsubstantiated by any xrays.  (ECF No. 29-4 at 33.)  On June 8, 2010, Dr. Thomatos examined Plaintiff and indicated that the Indocin and the TENS unit is working great for his back and that he is able to function.  (ECF No. 29-4 at 30.)  On September 19, 2010, Plaintiff was seen by J. Krpan, D.O., who noted that Plaintiff's spine exam palpated from the cervical spine to the sacrum reveals no significant abnormalities, he has a slight bit of muscle spasm in the lumbar region about L2-L3 on the right side, and he has some discomfort with palpation over the sciatic nerve in the buttocks.  (ECF No. 29-4 at 31.)

On September 24, 2010, Dr. Thomatos noted that Plaintiff stated that he was back to normal without any problems regarding his low back.  (ECF No. 29-4 at 32.)  On October 20, 2009, Dr. Thomatos noted that Plaintiff was able to get up and down and walk without difficulty and that there was no indication for Plaintiff's low tier request because his knees are working fine and he is able to get up and down without difficulty.  (ECF No. 29-4 at 33.)  On January 7, 2011, Dr. Thomatos noted that Plaintiff's Indocin seems to control Plaintiff's low back pain. (ECF No. 29-4 at 34.)

On May 20, 2011, Plaintiff was seen by Dr. Curtis Allen, who observed that Plaintiff had palpation of the cervical to the lumbar spine reveals no bony deformity, 5/5 motor skills, and a normal gait and was able to walk on his heels and on his toes.  (ECF No. 29-4 at 35.)  Dr. Allen found that Plaintiff had lumbar pain with descriptions of neuropathic-type pain in a nondermatomal fashion.  (ECF No. 29-4 at 35.)

On May 2, 2011, Plaintiff had x-rays of his back, which revealed a mild disc space narrowing at L5-S1, minimal spurring of S1, and mild narrowing and sclerosis of facet joints at L5-S1.  (ECF No. 29-4 at 37.)  Dr. Lucy Miller found that the x-rays showed that mild degenerative changes have developed at L5-S1.  (ECF No. 29-4 at 37.)

On July 25, 2011, Plaintiff had an electromyogram and nerve conduction study done which had normal results, except for decreased peroneal compound motor unit amplitudes on the left (symptomatic) side.  (ECF No. 29-4 at 38-43.)  Further, the study found:

> The decreased amplitudes were attributed to an anomalous innervation with a deep accessory branch of the peroneal nerve traversing posterior to the lateral malleolus.  Please correlate with clinical findings and/or other diagnostic testing results.  If symptoms persist re-examination in the future may clarify the results.

(ECF No. 29-4 at 38.)

The medical evidence shows that Plaintiff had received x-rays, an electromyogram and nerve conduction study, and consultations in response to his complaints of lower-back pain during his incarceration at Sierra Conservation Camp.  The results of Plaintiff's consultations and tests prior to his transfer to SATF do not indicate that he had a severe orthopedic condition which physically prevented him or made it dangerous for him to climb to the upper bunk or be on the upper tier.

In January 2012, Plaintiff was transferred to SATF.  After Plaintiff's transfer to SATF, Defendant saw Plaintiff on multiple occasions in 2012 and early 2013.  Plaintiff was also seen by another primary doctor and specialists during this time period.

On February 28, 2012, Defendant observed that Plaintiff's gait was normal.  (ECF No. 29-5 at 3.)  Defendant noted that Plaintiff "came in ambulating without distress."  (ECF No. 29-5 at 3.)  On March 16, 2012, Defendant noted that he observed Plaintiff after the appointment as he was walking in the yard back to his building with a normal gait and not limping.  (ECF No. 29-5 at 4.)  Defendant also noted that he explained to Plaintiff that he did not qualify for a lower bunk based on CDCR criteria.  (ECF No. 29-5 at 4.)

On March 29, 2012, Plaintiff had an x-ray of his right hip, which was ordered by Defendant, and the x-ray revealed no acute hip fracture or dislocation, joint space was normal, and mineralization appears normal.  (ECF No. 29-5.)  On that same day, Plaintiff also had an x-ray of his right knee, as ordered by Defendant, which revealed no acute fracture or abnormal knee finding, no suprapatellar effusion, no joint narrowing, no erosions or spurs, and no joint

calcifications.  (ECF No. 29-5 at 7.)  On April 11, 2012, Plaintiff had an x-ray of his lumbar spine, which was ordered by Dr. Scharffenberg, that revealed no lumbar spine fracture or other acute changes and mild spondylosis changes identified at the L5-S1 disc levels, with severe degenerative disk disease at the L5-S1 disc levels.  (ECF No. 29-5 at 8.)

On May 23, 2012, Dr. Robert Scharffenberg noted that Plaintiff had chronic low back pain and that Plaintiff was using a TENS unit.  (ECF No. 29-5 at 6.)  Dr. Scharffenberg noted that Plaintiff's back was tender on the right parapsinally in the right low lumbosacral spine.  (ECF No. 29-5 at 9.)  On June 27, 2012, Dr. Scharffenberg noted that although Plaintiff complained that he had difficulty walking, Plaintiff was "able to walk unaided just fine at this visit."  (ECF No. 29-5 at 10.)  Dr. Scharffenberg did note that Plaintiff's x-ray report showed severe degenerative disk disease at L5 to S1.  (ECF No. 29-5 at 10.)  Dr. Scharffenberg also found that Plaintiff appeared to be unhappy with care no matter what was suggested, and was generally demanding and unhappy.  (ECF No. 29-5 at 10.)

On July 24, 2012, Defendant saw Plaintiff and noted that Plaintiff was not eligible for ADA status at that time.  (ECF No. 29-5 at 12.)

On July 31, 2012, Plaintiff had an MRI of his back that revealed slightly low-lying conus at level of the L2 and central disc extrusion at L5/S1 with loss of normal disc space height and narrowing of both neural foramina and probable impingement of both exiting L5 nerve roots at neural foraminal compartment.  (ECF No. 29-5 at 13.)

On August 14, 2012, Defendant examined Plaintiff after receiving Plaintiff's MRI results.  (ECF No. 29-5 at 14.)  On October 19, 2012, Defendant noted that Plaintiff had no muscle weakness.  (ECF No. 29-5 at 17.)

In October 2012 and March 2013, Plaintiff was seen by two Telemedicine Neurological Surgical Consultation physicians, Dr. Rahimifar and Dr. Leramo, who both did not recommend that Plaintiff receive a lower bunk Chrono.  (ECF No. 29-5 at 18-19, 23.)  Dr. Rahimifar noted in October 2012 that Plaintiff was walking without any pelvic tilt and he was in no distress.  (ECF No. 29-5 at 18.)  Dr. Rahimifar found that Plaintiff had degenerative lumbar disc disease longstanding and chronic with narrowing of the disc space at L5-S1 with a small central calcified

disc at L5-S1 with slight left foraminal narrowing and right foramen patent.  (ECF No. 29-5 at 18.)  Dr. Rahimifar found that Plaintiff should avoid heavy lifting over 40 pounds and not do any repetitive bending and twisting.  (ECF No. 29-5 at 18.)  In March 2012, Dr. Leramo noted that Plaintiff had a mildly antalgic gait, symmetrical reflexes, and normal motor power.  (ECF No. 29-5 at 23.)  Dr. Leramo found that Plaintiff had chronic low back pain with degenerative disc disease at L5-S1 and that Plaintiff should not do any heavy lifting or repetitive bending and twisting.  (ECF No. 29-5 at 23.)

On November 6, 2012, Defendant examined Plaintiff and filled out a CDC 7410 that Plaintiff should have a soft lumbar corset and be restricted from heavy lifting and repetitive bending and twisting.  (ECF No. 29-5 at 22.)

On March 13, 2013, PA Tiggs-Brown saw Plaintiff and completed a Disability Placement Program Verification evaluation (CDC 1845), and noted that verification of claimed disability was not confirmed regarding mobility impairment.  (ECF No. 29-5 at 24-25.)  PA Tiggs-Brown indicated that Plaintiff was "able to ambulate greater than 100 yards without assistive devices." (ECF No. 29-5 at 25.)  On March 13, 2013, PA Tiggs-Brown completed a CDC 7410 form indicating that Plaintiff should have a bottom bunk for one-year.   (ECF No. 29-5 at 26.)  On March 18, 2013, Dr. Ugwueze approved the CDC 7410 request for a bottom bunk for one-year. (ECF No. 29-5 at 26.)

On April 15, 2013, Defendant noted that Plaintiff did not meet the criteria to be identified as disabled or DPM.  (ECF No. 29-5 at 30.)  Defendant prepared a CDC 7410 form that Plaintiff that Plaintiff should have a bottom bunk for one year, as well as the back brace and TENS unit that had previously been authorized.  (ECF No. 29-5 at 31-32.)

On May 21, 2013, Defendant noted that Plaintiff seemed to be seeking increased pain medications and that Plaintiff had been observed multiple times pushing another inmate in a wheelchair on the yard.  (ECF No. 29-5 at 33.)  On May 30, 2013, Defendant stated that he observed Plaintiff walking without difficulty or a limp to the clinic.  (ECF No. 29-5 at 34.)

Therefore, Plaintiff received numerous consultations and tests, including an x-ray and MRI, during his incarceration at SATF.  However, the consultations and tests do not support

1   Plaintiff's claim that he should have been given a lower bunk Chrono prior to April 15, 2013.

2   Plaintiff was observed walking normally and there is nothing to suggest that he could not climb

3   to the upper bunk.  Defendant noted that Plaintiff was walking without distress on multiple

4   occasions.  (ECF No. 29-5 at 3, 4, 34.)  In addition, Dr. Scharffenberg observed Plaintiff walking

5   without distress in 2012.  (ECF No. 29-5 at 10.)  Even PA Tiggs-Brown noted that Plaintiff was

6   able to ambulate greater than 100 yards without assistive devices and that Plaintiff's claimed

7   disability was not confirmed regarding mobility impairment.  (ECF No. 29-5 at 24-25.)

8        The fact that Defendant's decision not to give Plaintiff a lower bunk Chrono differed

9   from that of PA Tiggs-Brown reflects nothing more than a " 'difference of medical opinion" as

10  to the need to pursue one course of treatment over another[, which is] . . . insufficient, as a matter

11  of law, to establish deliberate indifference."  Jackson v. McIntosh, 990 F.3d 330, 332 (9th Cir.

12  1996); Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004) ("[A] mere 'difference of medical

13  opinion ... [is] insufficient, as a matter of law, to establish deliberate indifference.' ") (citation

14  omitted); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.1989) ("A difference of opinion does not

15  amount to a deliberate indifference to Sanchez'[s] serious medical needs.").

16       Plaintiff fails to allege facts showing Defendant's conclusion was medically unacceptable

17  under the circumstances.  Plaintiff's belief that he should have been given a lower bunk Chrono

18  earlier does not suffice to create a triable issue of fact regarding whether Defendants' failure to

19  give a lower bunk Chrono earlier rose to the level of deliberate indifference.  See Jett v. Penner,

20  439 F.3d at 1096 (plaintiff must demonstrate "a purposeful act or failure to respond to a

21  prisoner's pain or possible medical need.") (citing Estelle, 429 U.S. at 104); see also Toguchi,

22  391 F.3d at 1058 ("[A] mere 'difference of medical opinion" as to the prescription drug plan is

23  not sufficient to invoke the Eighth Amendment.)  Plaintiff has failed to demonstrate anything

24  beyond his mere disagreement with the treatment provided.

25       Accordingly, two medical professionals at Sierra Conservation Center and one medical

26  professional at SATF agreed that Plaintiff was not entitled to a lower bunk/lower tier Chrono for

27  his back pain.  This suggests that Defendant's decision to not provide a lower bunk/lower tier

28  Chrono was not medically unacceptable under the circumstances. See Moreno v. Medina, 2013

21

WL 3350819, at * 4 (E.D. Cal. 2013) (fact that the same course of treatment was recommended by multiple physicians suggests that the treatment was not medically unacceptable under the circumstances).

Plaintiff has failed to establish that Defendant was deliberately indifferent to a serious medical need.  Rather, as evidenced above, Plaintiff was provided adequate treatment for his back pain and Plaintiff's mere disagreement with the treatment provided does not support a claim for deliberate indifference by Defendant.  Plaintiff has not submitted evidence to show that Defendant's decision to not write a lower bunk/lower tier Chrono for Plaintiff was medically unacceptable under the circumstances, nor that Defendant made that determination in conscious disregard of an excessive risk to Plaintiff's health.  Thus, Defendant is entitled to summary judgment.[2]

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that Defendant's motion for summary judgment be GRANTED and judgment be entered in favor of Defendant.

Further, the Court DIRECTS the Clerk of Court to assign a District Court Judge to the present matter because only the Plaintiff has consented to proceed before a United States Magistrate Judge.[3]

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections may be filed within fourteen (14) days after service of any objections.  The parties are advised that failure to file objections

---

[2] Because the Court has found that Defendant is entitled to summary judgment on Plaintiff's claim for deliberate indifference in violation of the Eighth Amendment, the Court need not and will not address Defendant's alternative argument that he is entitled to qualified immunity.

[3]   ECF No.  5.

1  within the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>,

2  772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir.

3  1991)).

IT IS SO ORDERED.

Dated:   **February 5, 2016**

_____
UNITED STATES MAGISTRATE JUDGE